NOT DESIGNATED FOR PUBLICATION

No. 119,342

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.N., A Minor Child.

MEMORANDUM OPINION

Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed October 11, 2019. Affirmed in part and dismissed in part.

*Rachel I. Hockenbarger*, of Topeka, for appellant natural father.

*Morgan L. Hall*, deputy district attorney, and *Michael F. Kagay*, district attorney, for appellee.

Before ATCHESON, P.J., MALONE, J., and DANIEL D. CREITZ, District Judge, assigned.

PER CURIAM:  J.N. (Father) appeals the district court's decision to terminate his parental rights to his daughter, A.N. Father claims the district court erred in finding him to be unfit and in finding that termination of his parental rights was in A.N.'s best interest. Father also claims the district court erred in denying him visitation of his daughter. Based on our review of the record, we find no grounds to disturb the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

We will review in detail the extended procedural background of this case. Father and C.W. (Mother) are the biological parents of A.N., who was born in 2011. In June 2012, the Kansas Department of Children and Family Services (DCF) received a report alleging that A.N. was being physically abused and neglected. Brenda Henry, a child protective specialist supervisor with DCF, spoke with Mother and Father individually and together. Henry felt it was "very difficult" to get "clear" answers from Father to the extent

1

that it made her question whether Father was mentally able to care for A.N. Ultimately, Henry determined that the allegations were unsubstantiated.

In late 2012 or early 2013, Mother and Father left Topeka and moved to Evansville, Indiana. After securing a lease on a residence there, Mother, Father, and A.N. returned to Topeka in mid-to-late January 2013 to visit family. Father dropped Mother off with her family, went to visit his own family, then took A.N. and went back to Indiana without telling Mother he was leaving or getting her consent to take A.N. According to Father, Evansville police came to his home a few days later, saw A.N., and instructed him to call Mother, who had sent them to check on A.N.

Back in Topeka, on January 22, 2013, Henry met with Mother, who told her that Father had taken A.N. to Indiana. After speaking to Father by telephone, Henry was concerned about Father "providing care alone" for A.N., so she "made a hotline report to the State of Indiana, with [her] concerns." Three days later, Henry spoke by telephone with Ashton O'Keefe, a family case manager with the Indiana Department of Child Services (DCS). O'Keefe spoke by telephone with Mother, who confirmed that Father had left Topeka with A.N. without her consent. Mother said that Father's ex-wife, V.P., had reported overhearing Father "on the phone yelling at [A.N.] to 'shut up' because she was crying." Mother also told O'Keefe that Father was schizophrenic, he was not taking any medication, and he had refused counseling in the past. Mother asserted that a doctor had told Father "that he is not allowed to be alone with his children," but she could not provide the doctor's name. She also "expressed concern" that Father possessed marijuana when he left Topeka for Indiana, and she worried that Father would leave A.N. alone.

When O'Keefe went to Father's residence on January 25, 2013, he observed that there was old food sitting out and dirty dishes piled in the sink. Father displayed "incoherent speech and a flat affect," but he was cooperative, explaining that he did not want to be with Mother anymore and "he could not 'trust her digits,'" meaning "he could

2

not trust [Mother's] fingers to not molest [A.N.]" Father told O'Keefe that Mother had been molested as a child and he had noticed some discoloration on A.N.'s vaginal and anal areas, but he did not know whether it was sexual abuse or diaper rash.

Father told O'Keefe that he had suffered a traumatic brain injury about 30 years earlier when he fell off a telephone pole while working. Father also stated that he had been diagnosed with PTSD but not with schizophrenia "'as far as he knows,'" and that "he committed himself to a hospital where he resided for 6 to 7 years for mental health issues," but he had needed no medication or treatment since his release. Father admitted to O'Keefe that he had left A.N. unattended in his car "the other day" while he went into the post office, and that witnesses had grown concerned when she "began to scream and cry." A voluntary drug test was positive for marijuana. A.N. was taken into Indiana state custody and placed into foster care "due to [Father's] mental health, lack of food in the home, and the condition of [A.N.]"

*Indiana child protective case*

On January 29, 2013, DCS filed a verified petition to have A.N. adjudicated a child in need of services based on "Father's drug abuse, untreated mental illness, admitted lack of supervision of [A.N.], taking [A.N.] to live in another state without the consent of [M]other, [M]other's inability to protect child from [F]ather, and both parents' need for ongoing services through child protection in Kansas." Father had supervised visits with A.N. on February 5 and February 7, 2013. DCS staff recorded positive impressions from the visits but also noted that Father "said a lot of random statements during the first visit," such as explaining that he was "'trying to be a better father and I can only do that if the other half of me, my brother, does too.'"

Father missed his February 14, 2013 visit with A.N. because he was in the emergency room after convulsions he believed were due to toxins left from the meth lab

3

that he believed had once existed in his house. A later investigation by the county health department found no indication that a meth lab had existed at the home. Father had additional supervised visits with A.N. on February 19, March 1, and March 5, 2013.

Around March 5, 2013, Mother—who had returned to Indiana—was arrested for domestic violence against Father. Father and A.N. had supervised visits on March 7, March 12, and March 14, 2013. During the March 12 visit and before the March 14 visit, A.N. called Father "Daddy." On April 5, 2013, A.N. returned to live with Mother and Father. A DCS worker came to Mother and Father's home each day for 60 days to check on them, and Mother and Father began potty training A.N.

On June 6, 2013, the Indiana court issued an emergency order noting that Father and Mother had fled the state with A.N. and their whereabouts were unknown, although DCS had presented evidence that they were in Kansas and did not intend to return. The court authorized DCS and law enforcement to take A.N. into immediate protective custody. Father later testified that he, Mother, and A.N. had returned to Kansas to visit family, and he was unaware that he could not take A.N. out of Indiana.

Stephanie Massey at Kansas DCF received "paperwork to do an Emergency Custody Order from Indiana," and she located A.N. at V.P's home in Topeka. DCF prevention and protection services investigator Stephanie Griffin and Massey went to V.P.'s home, where V.P explained that Father and Mother had come a few days earlier and asked her to watch A.N. Massey remembered A.N. as appearing clean and healthy. V.P. told Griffin that Mother and Father might be in Kansas City, but she was glad someone came to get A.N., who V.P. said would be safer with someone else rather than Father, who would "call up and scream and yell on the phone and get really nasty."

A.N. was returned to Indiana, where Mother and Father began the process of reintegration. By September 2013, they were having unsupervised in-home visits with

A.N. During an October 2013 court hearing, an Indiana judge suggested to Father that they should move back to Kansas, so the family returned to Topeka on October 4, 2013.

In October 2013, the Indiana courts sought to transfer the proceedings to Kansas under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), but "some of the guidelines regarding UCCJEA were not followed." Claire Hillman, a DCF social work specialist, flew to Indiana on October 5, 2013, took A.N. into custody, and brought her back to Kansas. Meanwhile, Hillman's supervisor, Heather Ford, spoke by telephone with Father and with Indiana DCS case manager Mario Reed.

*Kansas CINC proceedings*

On November 4, 2013, the Shawnee County District Court issued an ex parte order of protective custody placing A.N. in the care of the Secretary of DCF. The same day, the State filed a petition seeking to have A.N. adjudicated a child in need of care (CINC). On November 6, 2013, the district court placed A.N. in DCF temporary custody. KVC workers Nicki Unfred and Kathy Swank were part of A.N.'s case from the beginning. Swank remained A.N.'s family support worker until she left KVC in October 2017.

Mother and Father were allowed weekly one-hour visits with A.N. Swank believed that at the initial parent visitation, A.N. acted like she recognized Mother and Father. According to Swank, A.N.'s visits with Mother and Father generally "went okay," but "[t]hey were very controlled by [Father]." Swank also had monthly in-home visits with A.N. at her foster placement. Although it was also part of her job to visit parents at their homes, Swank never visited Mother and Father at their home because "there was always concerns for worker safety." She identified the primary safety issue as Father's "anger and his temper." Similarly, Unfred never conducted in-home visits with Mother and Father, stating she "didn't feel safe going into the home."

5

Aaron Pish, a therapeutic case manager at KVC, began working on A.N.'s case in mid-January or early February 2014. But Pish never evaluated whether Father's home would be safe or appropriate for A.N., and Pish never went to Father's home because he "felt there were significant safety concerns."

On February 8, 2014, the district court held an evidentiary hearing at which Mother and Father "stipulated or entered valid no contest statements to the petition on file," and the district court adjudicated A.N. to be a CINC. At the disposition hearing on April 7, 2014, the district court approved "the reintegration plan described in testimony from Aaron Pish." The district court also ordered an assessment of a relative placement and appointed a court appointed special advocate (CASA).

Sacha Childs, a licensed clinical marriage and family therapist with an infant and early childhood mental health endorsement, began seeing A.N. on February 6, 2014, after a KVC referral. Childs found that A.N. suffered from nightmares, felt intense distress, displayed physical rigidity even while sleeping, and was terrified of bathing, refusing to get into a bathtub. In addition, A.N. was "very fearful of others," was "much more reserved" than a typical child her age, and was hypervigilant, asking about every unexpected noise. Play therapy led to an improvement in A.N.'s behavior when being bathed by her foster family. According to Childs, A.N.'s foster parents noticed an escalation in her behavior "right before a visit," while after the visit, the behaviors would decrease "back to kind of [its] baseline."

On March 18, 2014, Mother and Father signed a written case plan. The goals included: maintaining a safe and stable home free from illegal substances and domestic violence; completing random UA's upon request, with any missed, refused, or diluted UA's to be considered positive; complying with the recommendations of any resulting drug or alcohol evaluations; obtaining verifiable sources of sufficient income; meeting with agency staff at least once per month; completing an anger management assessment

and following any resulting recommendations; and completing a psychological evaluation and following all recommendations. Pish reported that Father was resistant to the psychological evaluation.

About that time, according to the KVC caseworkers, A.N.'s visits with her parents began to deteriorate. According to Pish, Mother and Father needed "some coaching as far as attention to child-specific needs. For instance, they would bring multiple activities to a visit, and push from one activity to the next, as opposed to letting [A.N.] kind of guide how it would go." At a visit on April 3, 2014, Childs noted that Father had a hard time "following [A.N.'s] lead" and letting her explore and play at her own pace. For example, Father read A.N. a book, but when A.N. wanted to stop reading after a few pages and do another activity, Father insisted on finishing the book first. Childs believed that Father's insistence on finishing one task before beginning another left A.N. "developmentally . . . frustrated." Childs also saw a lack of attachment on A.N.'s part, as seen by A.N.'s failure to show sadness, concern, or anxiety when it was time for Mother and Father to leave.

Father's last visit with A.N. in 2014 was June 19, 2014. Pish believed that weekly visitation stopped "when our concerns continued to increase as far as safety goes." Swank understood that parental visitation had stopped because A.N.'s "behaviors had kept increasing. I mean, like she didn't want to take baths. She was having night terrors, nightmares. She was whining, clingy." According to Swank, they were "probably two to three months into visits before these behaviors started," and that KVC stopped the parental visits "at the therapist's recommendation." Swank also reported that A.N.'s foster mother stated that she "would beg her the night [before a visit] not to make her go."

Swank saw A.N.'s behaviors decrease after parental visitation ended, and Childs similarly observed that after the parental visitation stopped, A.N. became "more and more stabilized." According to Swank, KVC revisited the idea of parental visitation "[m]aybe[] every three or four months," but Childs did not recommend resuming parental visits.

7

In June 2014, psychologist Dr. Steve Hazel performed a psychological evaluation of Father to identify "areas where, as a parent, there are concerns," and determine how to change those areas to improve parenting. Hazel diagnosed Father with personality disorder, not otherwise specified, and noted an Axis III diagnosis of previous traumatic brain injury. Father told Hazel that he had been previously diagnosed with personality disorder and PTSD, but PTSD did not "come up" in Hazel's testing. Hazel ruled out schizophrenia as a diagnosis, noting that "the data didn't support" it. Hazel recommended that Father engage in therapy focused on personality features, anger issues, and working with others to achieve goals. He also recommended that, after beginning individual therapy, "it might be helpful for them to do some kind of couples' therapy."

Pish kept meeting regularly with Father. At least two staff members attended each meeting "as a safety precaution" because Father "tended to bring up past issues that had been resolved. And when we tried to get him focused on the tasks at hand, he'd get upset. And either raise his voice, or walk out of the meeting, and ending it abruptly." Pish felt that Father's inability to stay focused on the tasks at hand left him unable to understand the case plan tasks. When Pish left the case in October 2014, he "was not very optimistic." After Pish left the case, he received a voicemail from Father in which Father "recited [Pish's] license plate and [said that he] knew [Pish] was there to end his family."

After Pish left the case, KVC caseworker Amber Grooms began working with the family. Grooms understood that visitation had stopped because "after visits with mom and dad, [A.N.] had significant behavior change," including A.N. "going back to peeing and defecating," "[s]ucking her thumb," and being "more clingy." Grooms, Unfred, and Swank decided not resume visitation. Like Pish and Swank, Grooms did not go to Mother and Father's home because of "safety reasons." She also found their monthly meetings unproductive because Father would "rant" about "old caseworkers," refer to the Indiana proceedings, and "escalate" until staff terminated the meeting.

On October 20, 2014, the district court held a permanency hearing at which it reaffirmed DCF custody and left placement and visitation to DCF discretion. At the November 19, 2014 permanency hearing, the district court found that reasonable efforts had been made to assist and support the family to accomplish the permanency goals, and that Mother and Father had made adequate progress toward the goal of reintegration. The district court ordered DCF to "provide a target date of when it would be safe for [A.N.] to return home" and to provide a new case plan goal within 30 days to include visitation in the future but also reaffirmed that visitation would occur at DCF's discretion.

In January 2015, Father began individual counseling with licensed clinical social worker Terry Janzen. On March 24, 2015, Janzen wrote a letter describing his work with Father, which, at the time, focused mainly on Father's "abrasiveness." He explained: "[I]f you are not really close with him or have a real close relationship, he could become abrasive but the closer you are with him his demeanor totally changed." Janzen also noted a decrease in Father's anxiety.

The district court held a permanency hearing on May 19, 2015, at which it found that Mother and Father had made adequate progress toward achieving the goals of "reintegration/adoption." The district court found that reintegration continued to be a viable goal but that adoption would become a concurrent goal.

KVC asked Gale Gardner-Sparkman, a licensed specialist clinical social worker and registered play therapist, to provide co-therapy with and support for Childs. On July 14, 2015, Childs and Gardner-Sparkman had their first joint session with A.N. They showed A.N. pictures of Mother and Father, which A.N. buried under toys in a basket. When asked, A.N. said she did not know the people in the pictures. Right after the session, Foster Mother reported that A.N. "had wet herself in the session, and had defecated a bit in her pants." Childs believed that sometimes children in therapy urinate or defecate in their pants if "something is very stressful."

When Grooms left the case in August 2015, her overall impression of the case was that it was "pretty stagnant. It wasn't moving due to the concerns with the mental health." Her biggest concern about Father's ability to parent A.N. was

"just the consistency, never knowing how [Father] was going to be. I mean, even in our meetings, he was okay sometimes, and then he would go off on a rant, or we would get a phone call in the middle of the night. So, I mean, that was the biggest thing of never knowing what state his mental health would be in. And as far as him not addressing it, we felt it was not going to get better."

At the review hearing on August 17, 2015, DCF recommended that the case plan goal change to adoption alone. On August 25, 2015, the district court approved an agreement between the parties and, under that agreement and recommendations from therapists, ordered that the case plan goals remain reintegration and adoption pending three to four supervised visits including A.N., Mother, and Father, which would be recorded on video. On September 2, 2015, the district court held a hearing at which it reaffirmed its earlier order allowing the recorded, supervised visits.

The first supervised parental visit in 2015 occurred at Gardner-Sparkman's office, with Mother, Father, A.N., Childs, and Gardner-Sparkman present. A.N. was frightened at first, but overall, Childs found the visit better than those she had observed in 2014. Childs did notice that "tracking" was a problem. She explained that "tracking" was "really being able to take the child's perspective and letting the experience be about the child, and not about yourself."

After reviewing the recording of the visit and speaking with Mother and Father, Childs and Gardner-Sparkman supervised a second videotaped visit between Mother, Father, and A.N. During the second visit, A.N. was less afraid and seemed more comfortable with Mother and Father, but Childs thought that Father still struggled with tracking issues. Unfred later testified that although "the actual visits went okay," A.N.

10

deteriorated after the visits. Unfred believed that before the 2015 visits with Mother and Father, A.N. was "very well adjusted," but after those visits, "[A.N.] went back to wetting the bed, [having] nightmares, not being able to sleep, [being] clingy, [and being] whiney." Unfred believed that A.N. "was completely potty trained" before the visits, but "after one visit she actually wet herself on the way back to her foster home, which is at her age is something that she had not done in a long time."

When Swank had her next monthly visit with A.N. in her foster home, A.N. showed Swank a teddy bear that Father had given her at the last visit. Swank asked A.N. where she got the bear, and A.N. said she got it when she went to play at an office. When Swank asked who gave her the bear, A.N. said, "I don't know, just some man that was there to play with me."

Childs' "biggest concern" from the 2015 visits was the lack of attachment between A.N. and Mother and Father. Childs specifically noted that at the end of their visits, A.N. "had no affect of sadness, or concern, or anxiety at the end of a visit when it was time for them to separate." According to Childs, generally a child who had an attachment with her parents and went into foster care at about two-and-a-half or three years old would not lose or forget that attachment over time.

On January 2, 2016, Childs met with KVC staff to discuss continuing parental visitation. According to Childs, due to "concerns going on with the case plan tasks," A.N.'s behavior outside of therapy, and "the parents' lack of ability . . . or willingness . . . to comply with some of the things," the team ultimately decided not to continue parental visitation. When the team met with Mother and Father on January 5, 2016, and told them that visitation was ending, Father became upset, and he verbally attacked the team members. Childs tried to explain the therapeutic reasons for deciding to stop parental visitation, but Father was argumentative and eventually Childs stopped trying to explain because Father was not listening to her.

11

Janzen saw Mother and Father on January 28, 2016, and April 8, 2016. At those sessions, they told Janzen their views on how their "childhood issues" impacted their adult lives. Janzen noted that Mother and Father seemed like "they felt pretty hopeless" about reintegration with A.N. Janzen had no further contact with Mother and Father after April 8, 2016.

On June 1, 2016, Topeka Police Officer Kathleen Bleach responded to a domestic disturbance call, and Father said that Mother had bitten him, scratched him, and hit him in the head with her fist. Mother told Bleach that Father had thrown her in a chair and held her so tightly that she could not breathe. Mother and Father were both arrested for domestic battery.

In August 2016, Unfred took over as A.N.'s case manager. As a result, she met with Mother and Father "almost every month." She found the meetings "difficult" and described Father as vulgar and belligerent; she felt that he tried to intimidate her and she generally ended their meetings "due to his language [and] behavior." At one meeting, Father referred to Unfred and Swank as "a nasty cunt."

*Motion to terminate parental rights*

On October 7, 2016, the State filed a motion for finding of unfitness and termination of parental rights or appointment of permanent custodian. The State alleged that Mother and Father were unfit parents because of: (1) "Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unlikely to care for the ongoing physical, mental and emotional needs of [A.N.]," under K.S.A. 2016 Supp. 38-2269(b)(1); (2) "[f]ailure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family," under K.S.A. 2016 Supp. 38-2269(b)(7); (3) "[l]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or condition to meet the needs of [A.N.]," under

K.S.A. 2016 Supp. 38-2269(b)(8); (4) "[f]ailure to assure care of [A.N.] in the parental home when able to do so," under K.S.A. 2016 Supp. 38-2269(c)(1); and (5) "[f]ailure to carry out a reasonable plan approved by the court directed toward the integration of [A.N.] into the parental home," under K.S.A. 2016 Supp. 38-2269(c)(3).

On December 19, 2016, the district court held a review hearing at which Father appeared in person and through counsel. The district court set the trial for April 4, 2017. On February 14, 2017, the State filed its first amended motion for finding of unfitness and termination of parental rights or appointment of permanent custodian. The amended petition added new grounds for a finding of parental unfitness, including "the use of intoxicating liquors or narcotic drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child," under K.S.A. 2016 Supp. 38-2269(b)(3) and "the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) of K.S.A. 38-2269 apply," under K.S.A. 2016 Supp. 38-2269(b)(9).

At the March 2017 parent-worker meeting, Father got upset. According to Unfred, he stood about two feet from her "and was yelling and screaming." Unfred asked Father to leave, and that was the final in-person parent-worker meeting between KVC staff and Father.

At a hearing on March 13, 2017, Father took a drug test, which came back negative for all substances. One week later, the State moved to continue the trial and compel Mother and Father to undergo psychological evaluations, since the most recent psychological evaluations of Mother and Father occurred in 2014. Over Father's objection, the district granted the State's motion at a hearing in April 2017, continuing the trial and ordering Mother and Father to undergo psychological evaluations. The district court also denied Father's motion to reinstate visitation.

13

Hazel performed a second psychological evaluation of Father. During the evaluation, Father told Hazel about an incident in which Mother had tried to stab him, and Hazel felt "there were concerns in their relationship." Father acknowledged that when he drank, he would "rant and rave on the phone at night," even calling KVC. Hazel's final diagnoses of Father were "unspecified personality disorder . . . and then the similar kind of relationship distress with spouse." Hazel later testified that being in an environment where the parents fight or argue often harms a child.

At the case plan meeting in June 2017, Unfred told Father that they would no longer have in-person parent-worker meetings with him. Unfred offered to conduct their meetings by telephone because she no longer felt safe with Father, but Father refused. At that point, Father stopped communicating with KVC workers altogether.

At the beginning of October 2017, Detective Jared Strathman of the Topeka Police Department was assigned to a criminal damage case stemming from a September 2017 argument between Mother, Father, one of Father's daughters, and V.P. In November 2017, Strathman was assigned to investigate a criminal damage incident involving Mother and Father that had occurred on October 31, 2017. Mother told Strathman that she and Father were arguing, she broke the phone she was holding, and Father shoved her. Strathman arrested Mother on a criminal damage charge.

*Evidentiary hearing*

The trial began on December 26, 2017, with testimony from Hillman and Ford about the beginning of the proceedings here in Kansas, their communications with the Indiana DCS staff, and Hillman's initial investigation, which led to the filing of the CINC petition in November 2013. Massey, Henry, Bleach, and Strathman also testified that day about their involvement with the family, as reflected above.

14

Also on the first day, Father called V.P., who testified that Father was arrested for domestic violence during their marriage. V.P. testified that at some unspecified time in the past, Father was hospitalized and put on medication after he called a suicide hotline, but he stopped taking the medication because it made him tired and gain weight.

Pish's testimony took the rest of the first day of trial and the beginning of the second day, December 27, 2017. Along with his involvement as set forth above, Pish testified extensively about feeling "threatened" by Father; he pointed to "harassing voicemails," "verbal aggression during our monthly meetings," and an "almost obsessive nature" in the way Father "brought up prior issues that the agency felt [had been] resolved in [A.N.'s] best interest." Pish testified that staff members meeting with Father carried panic buttons that connected them directly to police. Pish never activated his panic button, and conceded on cross-examination that he had "[n]ot in-and-of-itself" identified a "safety issue," nor could he articulate a specific threat Father had made against him.

After Pish's testimony concluded, Grooms testified for the rest of the second day of trial, describing her involvement and impressions while working with the family, as set forth above. Over objection, the district court admitted into evidence State's Exhibit 43, which Grooms described as a "case activity log" she had created that purported to transcribe a voicemail she received from Father. The contents of that transcription are not in the record on appeal, but Grooms described it as "another example of [Father] continually going back to other caseworkers and the past incidences," including Father "ranting" about things that occurred when Grooms "wasn't even working on the case."

Childs testified after Grooms, and the State admitted into evidence State's Exhibit 13, the timeline Childs and Gardner-Sparkman created in July 2015, and State's Exhibit 14, which was the letter they wrote to the district court in August 2015. Childs testified that if A.N. resumed contact with Mother and Father, her behavior would regress. When asked what therapeutic steps would be necessary to achieve reintegration, Childs

15

discussed "years" of coaching, especially on tracking, and she wondered whether A.N. would want to reintegrate. Childs pointed out that A.N. had, by this time, lived longer outside of parental custody than she had lived with Mother and Father. She also noted that after A.N.'s visits with Mother and Father stopped, she progressed through therapy to the point where there were "no clinically significant concerns."

After Childs' testimony, Foster Father testified that A.N. considered herself a member of their family. He testified about A.N.'s activities at the time of trial as well as the positive changes in her behavior since her initial placement with their family. Foster Father testified that he wanted to adopt A.N., who he testified called him and his wife "[m]ommy and daddy."

Next, Gardner-Sparkman testified about her involvement in the case as set forth above. In addition, during her testimony, the district court admitted into evidence State's Exhibit 24, which she described as her "report to support [Childs'] written report of August the 7th."

Day five of the trial did not occur until January 16, 2018, over two weeks after day four. Hazel testified as an expert witness, describing the psychological evaluations he conducted in 2014 and 2017. The district court admitted into evidence State's Exhibits 38, 39, 40, and 42, which were Hazel's evaluations. Hazel also testified that he "was really concerned" about the instability in Mother and Father's relationship with each other. His evaluations had recommended that they needed to work on their relationship and making sure that substance abuse was not an issue. He noted that although Mother and Father seemed to obtain more stable housing between the first and second evaluations, they also had a "domestic incident" shortly before the second evaluation, which concerned him.

Foster Mother also testified about A.N.'s behaviors during her time in their home. She noted that A.N. seemed to have more accidents around the time of the visits with

16

Mother and Father, but she also testified that A.N. had an accident just three days earlier, for the first time since starting school in the fall of 2017.

The State also called Carrie Kaberline, Mother's probation officer in 2016 and 2017, who testified about Mother. As relevant to Father, Kaberline testified that Mother admitted using methamphetamines and amphetamines in February 2017 while living with Father. The district court admitted into evidence State's Exhibits 25, 26, and 27, which were documents related to Mother's probation.

Swank testified next and, along with the observations set forth above, she testified generally about her experience with Father being belligerent at meetings with support workers, stating that he "always . . . focused on the same things, like the wet diaper issue." According to Swank, "it was rare not to have to cut the meeting short" because of Father's demeanor, his language, and his tendency to stray off-task.

January 17, 2018, was the sixth day of the trial, and it began with testimony from Unfred. The district court admitted into evidence State's Exhibit 29, a case plan dated August 19, 2015; State's Exhibit 30, a case plan dated January 15, 2016; State's Exhibit 31, a case plan dated January 20, 2017; and State's Exhibit 32, a case plan dated June 29, 2017. After describing case plan tasks requiring Mother and Father to comply with requests for UAs and hair tests, Unfred testified that Father "has not come in and done any UA's for approximately a year. And he refused the hair tests that we requested. I believe, one was Court ordered and he refused that one as well." Unfred also noted a report that Father was using methamphetamine in July or August 2017.

Unfred testified that Father completed the case plan task of maintaining documented legal income. As for the task involving following the recommendations of the psychological evaluation, Unfred testified that Mother and Father "did participate in couples' counseling," but Father "always refused to take any type of medication." Unfred

17

testified that she did not consider Father compliant with this case plan task because Father was not participating in individual therapy and he "displayed a very distorted view of why his child was in foster care and not taking any accountability for that." She also opined that "his volatility, vulgar and belligerent actions towards staff shows that he wasn't making any progress on improving himself or how to conduct himself or how to interpret the reality of the situation at the time."

Unfred opined that the case plan goal should be adoption because A.N. "has been in foster care for four years, which is over half her life. And she's very well grounded where she's at. She's adjusted. She's happy, and I believe that's where she needs to remain." Unfred also opined that termination of Mother and Father's parental rights was in A.N.'s best interests, stating: "I do not believe the parents have completed their case plan tasks to the best of their ability." When asked to identify some of the barriers to reintegration, Unfred identified domestic violence as a "huge concern."

The seventh day of the trial, January 18, 2018, began with testimony from Wes Chaffin, a licensed master's level social worker who had not worked on A.N.'s case and who only appeared to testify about how KVC might proceed if the district court did not terminate Mother and Father's parental rights to A.N. Chaffin had reviewed A.N.'s file and he testified that he had no reason to disagree with changing the permanency plan goal to adoption, and he agreed that termination of parental rights was in A.N.'s best interests.

The trial resumed on January 19, 2018, with Janzen's testimony about counseling Father individually and Mother and Father as a couple. Janzen stated that he and Father discussed the issue of medication "several times" during their sessions. Father stated he was not interested in taking medication. Janzen also testified that personality disorders generally required "long-term treatment" of perhaps a "couple of years" or longer. Janzen did not talk to Father about seeking more therapy for his personality disorder, nor did he refer him to someone else to do so.

18

Father testified next. The district court admitted into evidence Father's Exhibit 39, which was a certificate of completion of an anger management program, and Father's Exhibits 40, 41, 42, and 43, which were not described in the record. Father testified that he tried his best to accomplish the case plan tasks. For example, between 2014 and 2016, he completed four different parenting classes. As for his therapy with Janzen, Father said that he saw changes in himself and his reactions to situations, as well as changes in how he and Mother communicated with each other. Father acknowledged that "domestic violence is an issue," but he asserted that "[i]t is not completely understood in this given situation." Father testified that he had "absolutely no concerns" about A.N. returning to his home. When asked if he planned to keep living with Mother, Father replied that they lived together at the time of his testimony but he could not know the future.

After Father testified, Mother testified briefly. The district court then took the matter under advisement.

Almost two months later, on April 6, 2018, the district court convened a hearing to announce its decision from the bench. After considering "the record during trial, the record in the court file which includes, but is not limited to, facts supporting the CINC adjudication and disposition, the case plan tasks, progress reports from the agency, judicial notice of prior admitted court records, and after considering the arguments of the parties," the district court found that there was clear and convincing evidence that Mother and Father were unfit, and it terminated their parental rights to A.N.

On April 17, 2018, the district court issued a written journal entry memorializing its findings. The district court based its finding of unfitness on the following statutory factors: (1) Father's emotional or mental illness, which the district court found was "of such duration or nature as to render [Father] unable to care for the ongoing physical, mental, and emotional needs of [A.N.]"; (2) Father's "use of intoxicating liquors or narcotic drugs of such duration as to render [Father] unable to care for the ongoing

19

physical, mental, or emotional needs of [A.N.]"; and (3) Father's "lack of effort . . . to adjust [his] circumstances, conduct or condition to meet the needs of [A.N.]." See K.S.A. 2018 Supp. 38-2269(b)(1), (3), and (8). The district court also found that Father was unfit because A.N. had "been in an extended out-of-home placement as a result of actions or inactions attributable to [Father]" and Father had "fail[ed] to carry out a reasonable plan approved by the court directed toward the reintegration of [A.N.] into the parental home." See K.S.A. 2017 Supp. 38-2269(b)(9) and (c)(3). The district court found that Father's conduct or condition was unlikely to change in the foreseeable future. The journal entry reflected that the district court had considered A.N.'s physical, mental, and emotional health and concluded that "termination of parental rights is in the best interests of [A.N.] and [her] physical, mental or emotional needs . . . would be best served by termination of parental rights." Father timely appealed.

## DID THE DISTRICT COURT ERR IN FINDING FATHER UNFIT?

The revised Kansas Code for Care of Children (Revised Code), K.S.A. 2018 Supp. 38-2201 et seq., governs the termination of parental rights. A district court may grant a motion to terminate parental rights to a child who has been adjudicated to be a CINC if it "finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a). To determine whether a parent is unfit, the district court "shall consider, but is not limited to," statutory factors set forth in K.S.A. 2018 Supp. 38-2269(b).

> "'When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated.' [Citations omitted.]" *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

20

During this review, this court does not reweigh conflicting evidence, nor does it redetermine witness credibility or questions of fact. 56 Kan. App. 2d at 445, citing *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

*Father's failure to include evidence in the record on appeal*

The party claiming error "has the obligation to insure a sufficient record for us to consider those arguments . . . . If, as here, an argument depends on facts, those facts must be in the record." *In re A.A.-F.*, 310 Kan. 125, ___, 444 P.3d 938, 951 (2019). Here, the record on appeal consists of 11 volumes of transcripts, which reflect the entirety of the trial before the district court, and a single volume of documents filed with the district court. It does not contain, however, any of the over 120 exhibits admitted at trial. The admitted trial exhibits included the two recordings of Father's 2015 supervised visits with A.N.; at least portions of the transcript from the February 2014 adjudication hearing; case plans and permanency plans; reports submitted to the district court throughout the proceedings; diagnostic assessments and evaluations of Father; a transcript of a voicemail Father left for Grooms; and "the clinical record" of Childs' treatment of A.N., including progress notes and a treatment plan. The district court also admitted into evidence over 40 exhibits that were not individually described on the record.

Thus, the district court had before it a great deal of evidence which this court cannot review. Father's failure to provide this court with such a large portion of the evidence admitted at trial and considered by the district court leaves this court unable to provide meaningful "review of all the evidence," as required to review the sufficiency of evidence supporting a decision to terminate parental rights. See *In re K.L.B.*, 56 Kan. App. 2d at 445.

To the extent that the district court's oral ruling in this case clarifies and does not conflict with the written journal entry, this court may consider the reasons given from the

bench. See *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 402, 77 P.3d 130 (2003) ("Although the journal entry itself contains minimal findings, the court's ruling from the bench does clarify some of the reasons for the court's decision."). Here, the district court's oral ruling made clear that it relied on information in certain trial exhibits to support its finding that grounds existed to terminate Father's parental rights, referring to State's Exhibits 37, 38, 39, 40, 41, and 42, and respondent's Exhibits 12, 31, 32, and 33. For example, the district court relied on testimony from State's Exhibit 41, which was admitted at trial and which consisted of excerpts from the transcript of the adjudication hearing that occurred on February 28, 2014. But neither State's Exhibit 41 nor a full transcript from the 2014 adjudication hearing is in the record on appeal. The district court also relied on State's Exhibit 37, which is described at trial only as "court reports" prepared by Unfred, and which is not in the record on appeal.

When this court cannot tell the content of the evidentiary exhibits the district court relied on in making its decision, it presumes that those exhibits contain the necessary information to support the district court's conclusions. See *In re A.A.-F.*, 310 Kan. at ___, 444 P.3d at 952-53. Without those exhibits, this court has no way to determine whether the information within the exhibits sufficiently supported the district court's findings. As the appellant, Father bore the burden to designate a record sufficient to show his claimed error and, if the record is insufficient to show error, his claims fail. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013).

*Sufficiency of the evidence to show unfitness*

The district court in this case based its finding of unfitness on the following statutory factors: (1) Father's emotional or mental illness, which the district court found was "of such duration or nature as to render [Father] unable to care for the ongoing physical, mental, and emotional needs of [A.N.]"; (2) Father's "use of intoxicating liquors or narcotic drugs of such duration as to render [Father] unable to care for the ongoing

22

physical, mental, or emotional needs of [A.N.]"; and (3) Father's "lack of effort . . . to adjust [his] circumstances, conduct or condition to meet the needs of [A.N.]." See K.S.A. 2017 Supp. 38-2269(b)(1), (3), and (8). The district court also found that Father was unfit because A.N. had "been in an extended out-of-home placement as a result of actions or inactions attributable to [Father]" and Father had "fail[ed] to carry out a reasonable plan approved by the court directed toward the reintegration of [A.N.] into the parental home." See K.S.A. 2017 Supp. 38-2269(b)(9) and (c)(3). The district court found that Father's conduct or condition was unlikely to change in the foreseeable future.

When this court reviews a finding of parental unfitness for which the district court relied on multiple statutory factors, consideration of all the factors is unnecessary as long as clear and convincing evidence supports a finding of unfitness based on at least one of the factors. See *Interests of G.A.-S.*, No. 118,579, 2018 WL 2170077, at *3 (Kan. App. 2018) (unpublished opinion). Here, in deciding whether the evidence is sufficient to uphold the district court's finding of unfitness, we will review only two of the statutory factors: (1) Father's lack of effort to adjust his circumstances, conduct, or condition to meet A.N.'s needs and (2) A.N.'s extended out-of-home placement as a result of Father's actions or inactions and Father's failure to carry out a reasonable court-approved plan directed toward the reintegration of A.N. into the parental home.

*Father's lack of effort to adjust his circumstances, conduct, or condition to meet A.N.'s needs—K.S.A. 2017 Supp. 38-2269(b)(8)*

In its written journal entry, the district court found:

"The Case Plan established on March 18, 2014, and [*sic*] was signed by both parents. Assigned tasks included maintaining a safe and stable home environment, free from illegal substances and domestic violence; both parents were to comply with random UA's at the Agency's request; RADAC assessments were to be scheduled and the recommendations followed; parents were to obtain verifiable legal sources of income

23

sufficient to meet [A.N.'s] needs; parents were to meet with Agency staff at least once per month; both parents were to seek out an assessment for and complete anger management services and follow the recommendations; Father was to schedule a psychological assessment and follow the recommendations."

The district court also found "that parents have a long-standing history of domestic violence and/or domestic conflict[,] including an incident as recent as October 31, 2017." The district court noted that Mother and Father had not been in therapy since before that incident and that "Father admitted that he did not have a residence at the time of trial." The district court continued:

- "As was testified to by many witnesses, case plan tasks can be 'checked off' by parents but the true test of compliance is whether or not actual change in life status and behavior occurs and it was demonstrated that parental tasks have been checked off without substantive behavioral changes by the parents.
- "Father has been hostile and uncooperative with the Agency workers and intimidating through his conversations and conduct. Father admitted that these actions did not assist his case and his reintegration efforts with [A.N.] Father, . . . when asked what he needed to do to get [A.N.] home, did not mention drug treatment, therapy or domestic violence resolution, but he did mention that he needed to buy a home.
- "Parents were assigned case plan tasks by the Agency, those tasks were approved by the Court to address why [A.N.] was adjudicated a child in need of care, but there are key areas where the parent's [*sic*] efforts, or lack thereof, have failed. Namely, Father's conscious and deliberate intimidation actions with Agency personnel and his choice or inability to focus on the immediate needs of his child's case during his interactions with the Agency personnel, created significant barriers to reintegration; parents' domestic violence issues have not improved . . . ; both parents have drug concerns that have not been fully addressed; mental illness continues to remain a concern wherein further treatment is needed.
- "Tasks related to parents' mental illness have not been completed and would take years to adequately address, due, in large part, to parents['] failure to engage in ongoing recommended treatment.

24

. . . .

- "Parents have, at times, refused to participate in the case plan. Father engaged in actions that hindered his ability to achieve reintegration."

In its oral ruling, the district court explained:

"Simply put, the evidence in total demonstrates that parents, either through their choice or an inability, have not completed case plan tasks designed to allow them to reintegrate with their child. Tasks approved by the Court that have been awaiting completion since March 14—excuse me—March 18th, 2014. These tasks were developed to help parents adjust their circumstances, conduct or conditions so that they could reintegrate with [A.N.] And at time, parents have flat out refused to participate. And [F]ather, in particular, has engaged in actions that he admits hindered his ability to achieve reintegration with his child."

Father argues that the district court gave "entirely too much weight" to "[t]he conflict between [F]ather and agency staff." He contends that the district court should have given more weight to the "many goals" he did complete, which Father covers in detail. Father asserts that he "so alienated many agency staff that he simply was not given a true opportunity to reintegrate with his child," even though "there is no evidence in this record that his irascible personality impacted his ability to care for his child."

But this court does not reweigh evidence, nor could it when so much of the evidence that was before the district court is not included in the record on appeal. And even disregarding Father's contentious relationship with agency staff, there was other evidence sufficient to support the district court's finding that Father had failed to put forth effort to adjust his circumstances, conduct, or conditions to meet A.N.'s needs.

Domestic violence was an ongoing concern in these proceedings. V.P. testified that Father was arrested during their marriage for domestic violence. The petition filed in Indiana in March 2013 alleged that there had "been documented domestic violence

25

incidents between mother and father." Mother did not appear in person at a March 5, 2013 progress hearing in the Indiana proceedings because she was "in custody . . . due to domestic violence incident against father." Ford testified at trial that the Indiana case manager alerted her to domestic violence between Mother and Father. The initial CINC petition filed in Kansas on November 4, 2013, alleged that A.N. was "at risk to exposure to Domestic Violence in the home." Bleach testified about a domestic violence incident she responded to on June 1, 2016, involving Mother and Father, after which Mother and Father were both arrested for domestic battery.

Strathman testified about a criminal damage case that resulted from a September 2017 argument between Mother and Father during which Mother broke the mirror on Father's truck. Strathman investigated another incident that occurred on October 31, 2017; Mother alleged that Father shoved her during that argument. Swank, who was A.N.'s family support worker from the time A.N. came into Kansas custody until October 2017, testified that during her time on the case, Father failed to complete the case plan task that required "no more domestic violence between him and [Mother.]"

Unfred also testified that there was domestic violence during her involvement in the case. Unfred specifically testified that domestic violence was "a huge concern" with respect to reintegration. She testified that "the first domestic violence incident" happened at Mother and Father's apartment complex, and she described Father as being "very dramatic" and "very blaming of" Mother, specifically noting that he was not the one being criminally charged. Unfred felt Father "was more worried about blaming [Mother] for everything that had gone wrong than continuing to try to work with us."

Janzen testified that he spoke with Mother and Father about domestic violence and although they "did seem to acknowledge that they understood that sort of behavior was not helpful in getting [A.N.] back," they "did not necessarily acknowledge that they did something that would require [A.N. to be] taken away." Father testified at trial:  "I fully

26

understand that domestic violence is an issue. It is not completely understood in this given situation." He testified that he and Mother lived together at the time of trial but, for them to continue to live together with A.N., Mother would have to "reassure [Father] that the need to demonstrate or physically use violence as an expression to deal with a given situation is not going to cause [Father] to be unsafe." Father also agreed that this discussion would need to occur before A.N. could return to the home.

Taken as a whole, there was sufficient evidence to support the district court's finding that Father had failed to make an effort to adjust his circumstances, conduct, or conditions with respect to the chronic domestic violence that occurred in his relationship with Mother. Thus, there was sufficient evidence to support the district court's finding of Father's unfitness under K.S.A. 2017 Supp. 38-2269(b)(8).

*A.N.'s extended out-of-home placement as a result of Father's actions or inactions and Father's failure to carry out a reasonable court-approved plan directed toward the reintegration of A.N. into the home—K.S.A. 2017 Supp. 38-2269(b)(9) and (c)(3)*

In the written journal entry, the district court found: "The child has been out of home nearly 2/3rd of her life and her removal is directly related to the actions or inactions of both parents." The district court also explained when ruling from the bench:

> "In summary, the evidence demonstrates that this child has been in out-of-home [placement] for nearly two-thirds of her life. And the removal is directly related to the actions or inactions of both parents. Actions and inactions which lead to CINC adjudication, and Court—and the parents have failed to carry out a reasonable reintegration plan approved by this Court, designed and directed in integrate [A.N.] in the home.
>
> "Domestic violence, drug and alcohol usage, and mental health concerns left untreated, lack of consistent stable housing and a generally uncooperative attitude, at times, actual refusal to complete aspects of the plan by parents. And that is with both, two of the staff at DCF, KVC and with key components of the reintegration plan by parents.

27

So in light of it's [*sic*] significant duration of the parents' unfitness, and the chronic nature of their shortcomings, in spite of numerous state and private services offered to them."

Father acknowledges that at the time of trial, A.N. had been in out-of-home placement since November 2013—over four years. He contends, however, that it is unfair to attribute A.N.'s placement to his actions or inactions, asserting that out-of-home placement continued "because of the troubling relationship between [F]ather and agency workers." He contends that the lengthy nature of this case was in large part due to the unwarranted decision to end his visitation with A.N., and he argues that there was a "relationship between stopping the visits and the failure to reintegrate." Finally, Father argues that "case plans were developed that were lengthy, verbose, and challenging."

Once again, Father's failure to designate a complete appellate record makes consideration of his arguments more difficult. Father seeks to tie the 2014 termination of visitation to the validity of the district court's findings that A.N.'s out-of-home placement was attributable to Father and that Father failed to carry out a reasonable court-approved plan to reintegrate A.N. into the home, but the record on appeal is insufficient to determine whether Father's arguments have merit. Although there was trial testimony about the reasons for the termination of the visits in 2014, the record on appeal does not contain any court order terminating the visits, nor does it contain the May 29, 2014 letter in which Childs recommended that the court reconsider whether continuing parental visitation was in A.N.'s best interests. The letter may have been admitted as evidence at trial, but it is not included in the record on appeal.

Moreover, by asking this court to determine that stopping parental visitation in 2014 was error that directly led to A.N.'s continued out of home placement, Father asks this court to engage in too much speculation. The statutory factor the district court found was that A.N. "has been in extended out of home placement as a result of actions or inactions attributable to the parent." See K.S.A. 2017 Supp. 38-2269(b)(9). At the time of

28

the trial, A.N. had continuously been in out of home placement for over four years. As discussed above, some of the barriers to reintegration identified by staff testimony at the trial had nothing to do with visitation or the lack thereof; one barrier was the ongoing domestic violence in Mother and Father's relationship. Father's failure to remedy that situation—as seen by the continuing nature of the domestic violence—is independent of any of Father's visitation arguments, but it is still an example of Father's inaction that contributed to A.N.'s continuing out of home placement. It is also an example of how Father "fail[ed] to carry out a reasonable plan approved by the court directed toward the integration of [A.N.] into a parental home," which is the second circumstance the district court relied on to find that this statutory factor applied here. K.S.A. 2017 Supp. 38-2269(c)(3). Thus, Father's challenge to this portion of the district court's finding fails.

In summary, after review of all of the evidence included in the record on appeal, viewing that evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that Father was unfit by reason of conduct or condition which rendered him unable to care for A.N. and which was unlikely to change in the foreseeable future because of (1) his lack of effort to adjust his circumstances, conduct, or conditions to meet A.N.'s needs and (2) the fact that A.N. had been in extended out of home placement as a result of Father's actions or inactions and Father had failed to carry out a reasonable, court approved plan designed to reintegrate A.N. into his home. Thus, the district court did not err in finding Father unfit.

DID THE DISTRICT COURT ERR IN FINDING THAT TERMINATION OF FATHER'S PARENTAL RIGHTS WAS IN A.N.'S BEST INTEREST?

"If the court makes a finding of unfitness, the court shall consider whether termination of parental rights . . . is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental or emotional health of the child. If the physical, mental or emotional needs of the child

29

would be best served by termination of parental rights, the court shall so order." K.S.A. 2018 Supp. 38-2269(g)(1).

As this court has noted, "[o]ften the best interests of the child at the dispositional phase will turn on immeasurable nuances and '[a] best-interests determination is "in all cases a highly discretionary call."'" *In re P.J.*, 56 Kan. App. 2d 461, 465, 430 P.3d 988 (2018). Thus, this court reviews a best-interests determination for abuse of discretion. See *In re K.L.B.*, 56 Kan. App. 2d at 448. "A district court abuses its discretion if it makes an error of law, makes an error of fact, or was otherwise arbitrary, fanciful, or unreasonable." *In re A.A.-F.*, 310 Kan. at ___, 444 P.3d at 951.

The journal entry reflected that the district court had considered A.N.'s physical, mental, and emotional health and concluded that "termination of parental rights is in the best interests of [A.N.] and [her] physical, mental or emotional needs . . . would be best served by termination of parental rights." The district court's written journal entry included the finding that "[t]here is no attachment or bond between [A.N.] and her natural parents and, as such, no emotional trauma [A.N.] would experience as a result of termination of parental rights. [A.N.] is bonded to her current placement."

The district court's explanation of its ruling on A.N.'s best interests is much more expansive. When announcing its ruling from the bench, the district court found:

> "When considering the physical, mental and emotional health of this child, the Court
> finds that the evidence is clear and convincing that termination is in the child's best
> interest. As outlined in the factual analysis and conclusions they've reached above.
> Especially those opinions rendered by Ms. Childs regarding the bond of [A.N.] to her
> placement. Her physical, mental and emotional needs are best served by termination of
> parental rights. In making this termination decision, the Court has weighed the benefits of
> permanency for this child without the presence of parents, against continued presence of
> the parents, and the attended [*sic*] issues created for the child's life.

30

"The evidence clearly demonstrates that there is no attachment or bond between this child and her natural parents. Thus, there is no emotional trauma this child will experience as a result of termination. And that her current bonds and attachments would be better served by termination. Although a permanent custodianship is an option plead [*sic*] by the State, or one that the Court may consider, the evidence does not support a permanent custodianship. And again, I would reference the testimony from Ms. Childs about the goodness of the fit for [A.N.] and the foster parents. Foster parent's [*sic*] actions to seek out trauma books to help the child. Her schooling and grades are good. And the child identifies the foster parents as parents. So all of that supports the termination to allow a family relationship to continue to be establish and for the child to continue [to] flourish in her current setting.

"The Guardian *ad Litem* also recommends this course of action, as well. Parents have not requested the Court consider a permanent custodianship as an alternative determination. And the Court deems it important and imperative that this child find permanence in a nurturant [*sic*] and stable home in order to provide her with structure and guidance, love, support, and mental health treatment she deserves. Those needs can best be provided by parents or parental figures that place the child's needs above their own."

Father points to evidence that showed A.N. had an attachment to him, she wanted to see him, and that he showed good parenting during the visits. He contends that "[i]t is not in the best interest of a child to separate that child from its parent, especially at such a tender age." He also asserts that the agency workers' dislike of his parenting methods with A.N. during the visitation sessions resulted "in the child being somewhat detached from her father."

Father's argument essentially asks this court to reweigh the evidence, which we will not do. Father does not argue that *no* reasonable person would have made the decision the district court did, he merely contends that there was evidence that supported a reasonable decision that termination of his parental rights was not in A.N.'s best interests. But the standard of review for abuse of discretion is not whether every

31

reasonable person would agree with the district court; it is whether *any* reasonable person would agree with the district court.

Here, the district court engaged in a thoughtful analysis about the effect that terminating Father's parental rights would have on A.N. The district court referred to and found credible Childs' opinions about the bond between A.N., Foster Mother, and Foster Father. Childs testified that A.N. had "clearly attached and bonded to her foster parents," while with Mother and Father, A.N.'s "attachment is not there." She testified that A.N. did not appear to miss her parents when she did not see them and that her negative behaviors stemmed from seeing her parents not of missing them. Because there was no bond, the district court reasoned that A.N. would not experience any emotional trauma if parental rights were terminated.

The district court also considered Childs' comment that reintegration could take "years," and it also considered that A.N. had "been in state custody for a significant portion of her life, waiting for permanency." The district court considered Grooms' opinion that terminating parental rights was in A.N.'s best interests due to the domestic violence between Mother and Father and the safety concerns in their home. The district court noted how well A.N. was doing in her foster placement, how she was flourishing, and how her "regressive" behaviors were resolving. Considering all of this evidence, a reasonable person could agree with the district court that terminating Father's parental rights to A.N. was in the child's best interest.

### Did the District Court Err in Denying Father Visitation?

As a separate issue, Father contends that the district court erred by "denying Father visitation as important [*sic*] element of reintegration, as an aggravating factor in the error in finding unfitness and terminating parental rights." In this section of his brief, Father generally argues that the weight of the evidence before the district court did not

support the conclusion that Father's visits with A.N. were detrimental to her or that those visits should have been stopped. Father then asserts that ceasing the visits discouraged him, unnecessarily prolonged the case, "significantly" interfered with reintegration efforts and ability, and was contrary to A.N.'s best interests.

To the extent that Father is seeking to argue that the district court erred in terminating his parental rights in light of the lack of regular visitation with A.N., that argument is addressed above in the discussion of the sufficiency of the evidence supporting the district court's decision to terminate Father's parental rights. It appears, however, that along with arguing that the lack of visitation undermined the decision to terminate his parental rights, Father is also arguing that the district court erred in halting the visitation itself. To the extent that Father is trying to challenge the decision to stop visitation, this court lacks jurisdiction to consider the challenge.

This court may raise jurisdictional issues sua sponte. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 910, 416 P.3d 999 (2018). In Kansas, "'[a]ppellate jurisdiction is defined by statute; the right to appeal is neither a vested nor a constitutional right. . . . [T]his court may exercise jurisdiction only under circumstances allowed by statute; this court does not have discretionary power to entertain appeals from all district court orders.'" *In re T.S.*, 308 Kan. 306, 309, 419 P.3d 1159 (2018).

K.S.A. 2018 Supp. 38-2273(a) authorizes a party or interested party to appeal "any order of temporary custody, adjudication, disposition, finding of unfitness or termination of parental rights." "The statute creates five categories of appealable orders in a CINC case." *In re T.S.*, 308 Kan. at 310. If the plain language of the statute does not allow the appeal of an order, "we cannot add words to the statute." 308 Kan. at 310. In other words, "if the order doesn't fit one of those five categories, then the order isn't appealable by statute." *In re J.W.*, No. 107,839, 2012 WL 5205749, at *2 (Kan. App. 2012) (unpublished opinion); see also *In re N.A.C.*, 299 Kan. 1100, 1109, 329 P.3d 458 (2014)

33

("If there is to be appellate jurisdiction in this case, the [district court's order] must fit within one of these categories.").

The plain language of K.S.A. 2018 Supp. 38-2273(a) does not mention the right to appeal from an order about visitation. And at least one panel of this court has recognized that visitation orders do not fit within the five statutorily established categories of appealable orders in CINC proceedings. See *In re J.D.P.*, No. 117,638, 2018 WL 4373906, at *7-8 (Kan. App. 2018) (unpublished opinion) (dismissing for lack of jurisdiction Mother's challenge to the district court's refusal to allow unsupervised visitation). Thus, this court lacks jurisdiction to consider the propriety of any order by the court that stopped Father's visitation with A.N.

Finally, even if we had jurisdiction to address this issue, we note that the record reflects the only time the district court denied Father's request for visitation was at a hearing on April 4, 2017—after the State had filed the motion to terminate Father's parental rights. In fact, in 2015 the district court specifically ordered KVC to reinstate supervised parental visits. On all other occasions, the district court left parental visitation to KVC's discretion and it was the agency's decision to deny the parental visits.

Affirmed in part and dismissed in part.

\* \* \*

ATCHESON, J., concurring: I concur in affirming the Shawnee County District Court's decision terminating the parental rights of J.N. As much as I believe we should strive to decide appeals on the merits, we cannot adequately assess J.N.'s primary claim that insufficient evidence supported the district court's ruling—an inadequacy for which he bears both the legal responsibility and the legal consequence. As the appellant, J.N. had the obligation to furnish a record on appeal adequately establishing the errors he has

asserted. See *State v. Kidd*, 293 Kan. 591, 601, 265 P.3d 1165 (2011) (party claiming error has obligation to provide sufficient record for appellate review). The termination hearing consumed about a week of court time, and well over 100 exhibits were admitted as evidence. As the majority points out, the district court specifically referred to a number of those exhibits in setting forth its ruling and necessarily relied on the others.

J.N., however, has included none of the exhibits in the record on appeal. So he has both challenged the sufficiency of the evidence and kept a substantial part of that evidence from us on appeal. Given the exceptional factual and legal gap that omission has created in the appellate record, we cannot find for him on his challenge to the termination order. As this court has said:  "When there are blanks in that record, appellate courts do not fill them in by making assumptions favoring the party claiming error in the district court." *Harman v. State*, No. 108,478, 2013 WL 3792407, at *1 (Kan. App.) (unpublished opinion). As much as it disappoints me, especially in a termination of parental rights case, I would affirm the district court for that reason alone. I, therefore, join in that portion of the majority opinion.

I would not endeavor to analyze the truncated appellate record in this case to see if it contains sufficient evidence to support the district court. Even if it didn't, I would still affirm because a striking amount of obviously material evidence is not before us. I suppose I might take a different view in a case where the evidence omitted from the appellate record were minimal, plainly of little or no relevance to the points on appeal, or sufficiently discernable from what had been included in the record. But that case is definitely not this case. I, therefore, decline to join in that portion of the majority opinion assessing the sufficiency of the evidence actually included in the appellate record.

As to the last issue, I fully agree we do not have jurisdiction to consider J.N.'s challenge to the limitations placed on his visiting with his daughter during the course of this case.